UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS (HOUSTON)

```
IN RE:                          .   Case No. 21-31948
                                .   Chapter 11
WASHINGTON PRIME GROUP INC. .
and OFFICIAL COMMITTEE OF       .   515 Rusk Street
UNSECURED CREDITORS,            .   Houston, TX  77002
                                .
              Debtors.          .   Tuesday, October 12, 2021
                                .   2:27 p.m.
. . . . . . . . . . . . . . .
```

TRANSCRIPT OF EMERGENCY MOTION FOR ENTRY OF AN
ORDER (I) APPROVING LIMITED MODIFICATIONS TO THE
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
WASHINGTON PRIME GROUP INC. AND ITS DEBTOR AFFILIATES AND
(II) GRANTING RELATED RELIEF [1082]
BEFORE THE HONORABLE MARVIN ISGUR VIA VIDEOCONFERENCE
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES:

```
For the Debtor:          Jackson Walker
                         By:  MATTHEW CAVANAUGH, ESQ.
                              KRISTHY PEGUERO, ESQ.
                         1401 McKinney Street, Suite 1900
                         Houston, TX 77010
                         (713) 752-4200

                         Kirkland & Ellis
                         By:  CHAD HUSNICK, ESQ.
                         300 North LaSalle
                         Chicago, IL 60654
                         (312) 862-2009

                         Kirkland & Ellis
                         BY:  ALEX NICAS, ESQ.
                              JOSHUA SUSSBERG, ESQ.
                         601 Lexington Avenue
                         New York, NY 10022
                         (212) 390-4135
```

APPEARANCES CONTINUED.

```
Audio Operator:          Name, ECR

Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES (Continued):                            2



For Strategic Value       Haynes and Boone, LLP
Partners, LLC             By:  MARTHA WYRICK, ESQ.
                               CHARLES BECKHAM JR., ESQ.
                          1221 McKinney Street, Suite 4000
                          Houston, TX 77010
                          (713) 547-2000

                          Davis Polk & Wardwell, LLP
                          By:  DAMIAN SCHAIBLE, ESQ.
                               ANGELA LIBBY, ESQ.
                               ARYEH FALK, ESQ.
                          450 Lexington Avenue
                          New York, NY 10017
                          (212) 450-4000

For Official Committee    Brown Rudnick LLP
of Equity Security        By:  MICHAEL WINOGRAD, ESQ.
Holders                        BENNETT SILVERBERG, ESQ.
                          7 Times Square
                          New York, NY 10036
                          (212) 209-4800

For Wilmington Savings    Kilpatrick Townsend & Stockton LLP
Fund Society, FSB         By:  GIANFRANCO FINIZIO, ESQ.
                          The Grace Building
                          1114 Avenue of the Americas,
                          New York, NY 10036
                          (212)

Also Present:             KEVIN BARNES, Preferred Shareholder
```

1          (Proceedings commence at 2:27 p.m.)

2          THE COURT:  All right.  Good afternoon.  We're here

3     in the Washington Prime Group case.  It's 21-31948.  If you

4     wish to speak at today's hearing, if you would please press

5     "five star" on your line.

6          Mr. Stark, good afternoon.  Mr. Stark?  Or maybe

7     somebody else from his firm.  It's (212) 209-4800.  I'll come

8     back to him in a minute.

9          Mr. Nicas, can you hear me all right?

10          MR. NICAS:  Yes.  Yes, I can, Your Honor.  Can you

11     hear me okay?

12          THE COURT:  I can.  Good afternoon.

13          MR. NICAS:  Good afternoon, Your Honor.  Unless

14     Mr. Stark would like to hop in, I'm happy to jump into today's

15     agenda.

16          THE COURT:  Well, I want to find out -- I want to be

17     sure we aren't having technical problems, because he had

18     pressed "five star" to connect, and I don't hear him, so -- I

19     also don't see him.  Let's just wait a second and see what's

20     going on.

21          Mr. Winograd, that may have been your line, then,

22     because it probably is going to register the same on my phone

23     system.  Can you say something?  No, I can't hear you there.

24          Here's Mr. Stark coming back in.  Let's try that.

25     Mr. Stark, are you there?  Or Mr. Winograd again?

1          MR. SILVERBERG:  Your Honor, it's Bennett Silverberg

2 from Brown Rudnick (indiscernible) and not Mr. Stark.

3          MR. WINOGRAD:  And Judge, this is Michael Winograd.

4 I don't know if you can hear me now.

5          THE COURT:  I can hear you, Mr. Winograd, and I'm not

6 sure who spoke right before you.

7          MR. WINOGRAD:  I think that was --

8          MR. SILVERBERG:  Your Honor --

9          MR. WINOGRAD:  Oh, go ahead.

10          MR. SILVERBERG:  Sorry, Your Honor.  It's Bennett

11 Silverberg.

12          THE COURT:  Oh, Mr. Silverberg.  Good afternoon.  All

13 right.

14          MR. SILVERBERG:  Good afternoon.

15          THE COURT:  Mr. Nicas, let me just make a couple of

16 comments that I think go in somewhat opposite directions that

17 will at least tell you what I'm worried about today.

18          MR. NICAS:  Okay.

19          THE COURT:  And one is, I'm not sure this can be done

20 without notice to all parties, and not just to the master

21 service list.  So I don't know if we're here on good notice.

22 And then the comment I'm going to make that goes the opposite

23 direction is, I'm not sure why the moment after the effective

24 moment, the board couldn't do this anyway.  And so I -- I think

25 one of those tells you, I'm a little worried whether I can do

1  it, and then the other one says, I don't know that it's that

2  big of a deal to have the hearing on it.  But I need to address

3  at least the first one, and maybe find out why we're here on a

4  mod as opposed to the board deciding it's a smart move.  So

5  tell me a little bit about where we are, if you don't mind, and

6  tell me about whether, under the rules, what notice you think

7  is required to do this, because I couldn't, in my own mind,

8  find anything that said that it was okay not to serve

9  everybody, and I may have just -- I didn't exhaustively

10 research it, and I may have just missed that.

11        MR. NICAS:  So Your Honor, just to start, again,

12 Alexander Nicas from Kirkland & Ellis, counsel for the debtors.

13 We appreciate Your Honor taking the time this afternoon to hear

14 the debtors' emergency motion for entry of an order approving

15 limited modifications to the plan.

16        Your Honor, we believe that notice and service is

17 appropriate here, primarily because ultimately, the

18 modifications as proposed pursuant to the motion don't

19 adversely material or adversely affect the treatment of any

20 claims or interests under the plan without their consent.  Plan

21 modifications simply are tweaks to two definitions under the

22 plan to allow for certain cash that was otherwise to be paid to

23 the holders of Class 4B Webber's Town Term Loan Facility

24 Claims.

25        That cash under the plan was segregated into a

1  Webber's Town Cash Pool, another defined term under the plan,

2  and that cash was to be paid to the holders of the Webber's

3  Town Term Loan Facility Claims.  The proposal set forth in the

4  motion and the monefied definitions in the plan simply alter,

5  and really, this is all that's happening under the

6  modifications, simply alters whether those holders of the

7  Webber's Town Term Loan Facility Claims are to receive their

8  treatment under the plan in cash, or as additional debt that'll

9  be rolled into the new exit, new term loan exit facility, and

10  it's only impacting the treatment of those holders.  There are

11  only two holders of the Webber's Town Term Loan Facility, and

12  those holders both consent, have consented, to the

13  modifications set forth in the motion, and to the altered

14  treatment under the would be then modified plan.

15        So from a service and notice perspective, the reality

16  is that no other holders of claims or interests under the plan

17  are being altered or modified in any way, shape, or form.  The

18  existing GUC claim, general unsecured claims, still are

19  unimpaired under the plan.  They are to receive cash, paid in

20  full at emergence, or in the ordinary course of business

21  thereafter; and existing equity interests in other noteholders

22  whose claims or interests are being either equitized or paid in

23  cash, again, are receiving the exact same treatment under the

24  plan.

25        So ultimately, Your Honor, we think that service and

1  notice of this motion on the parties who we set forth in the

2  motion, including all the key stakeholders, the top 30, anybody

3  who requested notice in these Chapter 11 cases is proper,

4  because ultimately, there are no holders of claims or interests

5  whose treatment of claims are being impacted whatsoever.

6         THE COURT:  What does this change do -- are there any

7  conversion rights, for example, where they are increased

8  because there is now more debt?  And what does this do to the

9  feasibility of the plan as a consequence of more debt?

10         MR. NICAS:  On the first point, Your Honor, under the

11  new term loan exit facility term sheet that was filed on the

12  first day of the cases, there was a basket of $50 million,

13  which was apportioned for either an incremental additional term

14  loans, or a revolving credit facility.

15         So from the get-go of these Chapter 11 cases, it was

16  always contemplated that a new term loan exit facility could

17  flex by up to $50 million, vis-a-vis new money coming in to

18  fund an incremental term loan or a revolver.  So that's been --

19  everybody -- all parties have been on notice since the get-go.

20  It's under the plan, it's under the new exit facility term

21  sheet, that's all been -- it's been fully disclosed since day

22  one that that is a possibility.

23         And with respect to the -- that's on a conversion,

24  right, so all parties were aware of that from the get-go.

25         THE COURT:  I don't -- no -- I mean conversion into

1 equity.  Is there any conversion right to equity by the holders

2 of the facility?

3          MR. NICAS:  Of this -- of the Class 4B, Webber's Town

4 Term Loan Facility, the full amount of the claims were either

5 being paid in cash, or being converted into the new exit, new

6 term loan exit facility.  So there was never an equitization of

7 the claims of the holders of this facility.

8          THE COURT:  Right.  And the holder -- I'm not asking

9 my question well.  The holders of the exit facility.  Will they

10 have any future warrants, or conversion rights, or any ability

11 to dilute equity that would change by increasing that loan?

12          MR. NICAS:  The answer is no.  The answer is no.

13          THE COURT:  Okay.

14          MR. NICAS:  Those holders --

15          THE COURT:  Okay.  I just didn't ask the question

16 properly.

17          MR. NICAS:  -- those holders are debt holders, and

18 that is all they are.  The equity under the plan, the equity is

19 being apportioned to the note holders, and converting their

20 debt to equity, as well as any equity holders who have elected

21 -- have been able to, under the plan, based on the certain

22 definitions, and did so elect to receive equity under the new

23 plan.

24          So in effect, Your Honor, this -- the plan

25 modifications as proposed actually are avoiding another result,

1  which was, to the extent that the debtors needed to raise

2  additional cash to ensure that they could make the

3  distributions under the plan on the effective date, and to

4  adequately capitalize the reorganized debtors, additional cash

5  is needed to effectuate both of those prongs.

6         We could have delayed the process, and sought to

7  increase the rights offering.  That was potentially another

8  option to generate additional liquidity at emergence, and that

9  would have, if we had gone down that path, that would have

10 diluted any post-emergence holder of new common equity as a

11 result of the increased rights offering that would have been

12 put into place.

13        So what we did here, Your Honor, is actually to avoid

14 the results that I think that Your Honor's getting to, by

15 capitalizing debt that otherwise would have been paid in cash,

16 we've actually preserved the post-emergence ownership structure

17 for holders of new common equity without further dilution.  We

18 have only incrementally added up to $40 million of new debt to

19 the new term loan exit facility, which itself was already over

20 a $1.2 billion facility, so it's a very incremental increase,

21 in the overall outstanding amount of debt of the new term loan

22 exit facility, but additionally, for every dollar of debt

23 that's capitalized, the company retains on the balance sheet an

24 equivalent amount of cash, which, cash is king, and very

25 important in still very difficult times, overall.  Of course

1  COVID still exists, and the company continues to, you know,

2  plow through and execute on its business plan, and it has to

3  date met its forecast, and has performed operationally well, to

4  date.

5          This is not an issue -- a liquidity issue that

6  results from the operations of the company at all.  The

7  liquidity issue is, frankly, a result of the fact that over the

8  course of the Chapter 11 cases, through the negotiated

9  settlements with the equity committee and other parties, there

10 was an increase in the overall equity cash pool from

11 $40 million under the RSA to what turned out to be 50 million

12 -- $57, excuse me, million under the confirmed plan.  That's a

13 $17 million increase, and of course there was some additional

14 legal fees through an equity committee and other litigation

15 during the case, and as a result, the cost of the case, and the

16 distribution, the cash distributions to stakeholders,

17 increased, resulted in a small -- I wouldn't call it a deficit.

18         But where we are today, the company will benefit

19 greatly, and will be on solid footing from a feasibility

20 perspective at plan -- excuse me, at emergence, on the

21 effective date, and to continue post-effective date with

22 sufficient cash, it was necessary to determine how we could

23 utilize various levers to generate that additional liquidity

24 and make sure the company was on solid footing on day one,

25 post-effective date.

1          So this -- we view this, the plan modifications, as

2   ultimately the best available path forward to ensure that we

3   don't do exactly what Your Honor I think was getting at, which

4   is to dilute new common equity ownership.  Ultimately, these

5   holders were otherwise receiving debt under the plan, dollar

6   for dollar.  The Webber's Town Term Loan Facility was being

7   rolled into the exit, and there was a sub-portion of

8   $40 million to be paid in cash.  Those holders have elected to

9   forego that cash, and to capitalize their debt, allowing the

10  company to retain that cash on the balance sheet and leave it

11  on solid footing on day one.

12          With respect to service and notice in particular, I

13  think ultimately, 3019(b), I'm just reading the rule real

14  quickly, Your Honor.  I believe it's after notice and a hearing

15  that the Court can approve the modifications.

16          THE COURT:  That's rather the --

17          MR. NICAS:  The Court finds the --

18          THE COURT:  -- 3019(b) applies to individuals, right?

19          MR. NICAS:  3019(b), yes, and I guess 3019(a) is

20  before confirmation.  Of course, we're after confirmation, what

21  has --

22          THE COURT:  No, I'm saying, (b) is for an individual

23  debtor not a corporate debtor.

24          MR. NICAS:  Correct.  Correct.

25          THE COURT:  So we're after --

1           MR. NICAS:  We may be --

2           THE COURT:  -- we're after confirmation, and before

3   the effective date.  What rule do you think governs this?

4           MR. NICAS:  I -- Your Honor, I still think, even

5   though 3019(a) is before confirmation, I think we're still in

6   the same position here now post-confirmation.  Ultimately, as

7   we've laid out in the motion, and the substance of this, the

8   modifications themselves, warrant that a modification here is

9   necessary to ensure that the company can consummate the plan,

10  the debtors can consummate the plan, and apart from the rule

11  itself, of course, as we set forth in the motion, the

12  confirmation order and the plan itself authorize the debtors to

13  take all -- any and all action necessary to consummate the

14  plan, and to implement it, even post-confirmation.

15          THE COURT:  You know, we were going to the notice

16  question, though, so do you know what rule is going to govern

17  notice?

18          MR. NICAS:  Not off the top of my head, Your Honor.

19  Again, I think --

20          THE COURT:  Okay.

21          MR. NICAS:  -- the plan and the confirmation.

22          THE COURT:  All right.  Let me hear from other

23  participants.  I'm going to ask you one more question before we

24  go to them, though.  If the new board, after the effective

25  date, decides to repay the additional borrowing, may it do so

1 without penalty?

2          MR. NICAS:  Once the Webber's Town Term Loan Facility

3 Claims are rolled into the exit facility?

4          THE COURT:  Yes.  Can they then pay off that portion

5 that rolled in?

6          MR. NICAS:  The debt would be considered regular new

7 term loan exit facility debt, and it's subject to the credit

8 agreement, which the negotiations are being finalized on, and I

9 believe the answer is -- when you say without penalty, there is

10 call protection that's built in to the new term loan exit

11 facility --

12          THE COURT:  All right.  But would --

13          MR. NICAS:  -- under the credit agreement.

14          THE COURT:  -- but if they would waive the call

15 protection for a couple of weeks so the new board could pay it

16 off during the two weeks, not the whole thing, just this

17 incremental portion, it would seem to me that then I'm in a

18 position where I've done no harm.  Because the new board could

19 decide to return to where it would have been without this

20 amendment.  The call protection on this small amount is

21 probably largely irrelevant to them.  You know, maybe not.  And

22 maybe it's not necessary to get my approval today.  I'm not

23 insisting on it.  I'm simply asking so that I know where we

24 are, and this goes a bit into the notice issue for me as well,

25 because, you know, if -- I'm not sure notice is good.  I'm not

1  sure notice is not good.  But if I haven't changed what the

2  rights are by giving the board two weeks to reverse it, this

3  doesn't seem like much.

4          I've got somebody from 917.  That may be Ms. Libby.

5  Let me see.  Ms. Libby, is that you at (917) 691-8873?  Maybe

6  not.  Who do we have --

7          MR. FELDMAN:  No, Your Honor, that's Josh Feldman

8  from (indiscernible) that's been -- represent the lenders, the

9  ad-hoc group of lenders here, but --

10          THE COURT:  Thank you.

11          MR. FELDMAN: -- if you want to hear from Ms. Libby,

12  (indiscernible) inappropriate.

13          THE COURT:  No, no,  now's a great time, if you can

14  help me through that.

15          MR. FELDMAN:  Yes, well, by and large -- not even by

16  and large.  Full on, our group who has been involved with this,

17  you know, literally since February, and worked on the original

18  term sheets to which Mr. Nicas referred, we're supportive here.

19  Everybody understands how this case went.  A little bit more

20  time and a little bit more expense, but to get favorable

21  results, which is to say, a consensual plan which Your Honor

22  approved a short time ago.

23          As a result, there's a little bit more of a cash

24  need.  You asked initially, Your Honor, a question to the

25  effect of, why can't this just be done after the fact?

1  Mr. Nicas answered indirectly and correctly, that it

2  effectively can, in the sense that they always, always, always,

3  from the first term sheet, had built in room for an additional

4  $50 million of debt, and that was because things arise.  Now,

5  we had not anticipated that it would arise in this matter so

6  quickly, and I think we are supportive of the relief now,

7  because the hassle and kind of incremental expense of dealing

8  with amendments, and so forth after the fact, it doesn't seem

9  worth the candle.

10           So setting aside the procedural question, which I

11  certainly understand the concern, I would reiterate that this

12  has been done with Ms. Libby and her clients, of course, the

13  plan sponsors, the ad-hoc lender group is supportive.  The only

14  change to the lenders writ large is that the $1.3 billion of

15  exit debt will now be 1.34.  We've concluded it's a marginal

16  change, and net debt won't change at all, right, because

17  40 million of that cash will go out the door.  So gross debt

18  increases by 40, net debt increases by zero, the company came

19  to us and said, hey, this makes sense.  Let's do it in this

20  manner.  We absolutely agreed, and so we are supportive, and I

21  just thought we would put that out there.  And it is kind of a

22  win/win/win for everybody, in light of the facts where we

23  landed today.

24           THE COURT:  All right.  Thank you.

25           Ms. Libby, I see you've now joined in.  Thank you.

1 Good afternoon.

2     MS. LIBBY:  Good afternoon, Your Honor.  Angela Libby

3 on behalf of SVP.  I would largely reiterate what Mr. Feldman

4 said.  You know, at the end of the day, the company identified

5 a small gap and a small problem, you know, between now and

6 emergence, and it really looked to as few stakeholders as

7 possible to bridge that gap and solve the problem, with as

8 little impact on everybody else as possible.  And that was

9 really looking to SVP, who was the holder of the Webber's Town

10 Loan and looking to Mr. Feldman's client, and they really

11 stepped up to the plate here to just solve this issue and to

12 try to do it as seamlessly as possible.

13     And as to your question, I mean, as Mr. Feldman said,

14 this really is largely just trying to utilize existing credit

15 facility as negotiations are ongoing, and it could easily be

16 baked into that, and it really just avoids the need to sort of

17 round trip, you know, cash to these holders, and then

18 effectuate what could otherwise be done post-emergence, which

19 round tripping, you know, for that moment in time, would create

20 this gap that Mr. Nicas has -- you know, has identified.

21     So it really just is trying to make sure that we

22 stage things appropriately, so that we can have as seamless an

23 emergence as possible here.

24     THE COURT:  And do you see any problem, if I were to

25 add into an order that approves this, that for 14 days after

1  the effective date, the $40 million at the board's option can

2  be prepaid without penalty?  Is that going to really cause

3  heartburn to anybody?

4        MS. LIBBY:  Your Honor, I'd probably turn it over to

5  Mr. Feldman, because I don't want to speak for his client.

6  Obviously, you know, as Your Honor knows, my client will have

7  significant board representation, and has really worked with

8  the company to identify what this need is, and does anticipate

9  that this liquidity will provide stability, you know, for more

10 than two weeks.  So I think they probably have decent insight

11 here into what the plan does post-emergence, but I will leave

12 it to Mr. Feldman to weigh in, as to whether he has to initiate

13 the proper protocol.

14        THE COURT:  Mr. Feldman, would that cause any

15 problem?

16        MR. FELDMAN:  Hi, Your Honor.  Am I being heard?

17        THE COURT:  Yes, sir.

18        MR. FELDMAN:  Okay, thank you.  I -- we're not in a

19 position to accept that.  It's not an unfair proposal on the

20 face of it, but the economics of this are that, okay, we'll

21 accept more of the debt -- when I say we, by the way, I want to

22 point out that the Webber's Town holders are the sponsor

23 themselves, and one of my clients.  And they agreed to roll

24 into the existing debt, or the debt that's about to be

25 existing, on the exact same terms, and it's not just a question

1  of oh, what happens if I get paid without the call protection.

2  It's also -- it now represents a couple of weeks of

3  nonfungible, nontradeable, idiosyncratic debt, that would

4  actually create a new traunch under the credit agreement, and

5  might, you know, frankly, eliminate the efficiencies that we

6  were hoping to gain by pursuing the process in this manner.

7  I suppose I would stress, and I understand the

8  concern that you're expressing, but I'm certainly not in a

9  position to agree to that.  On behalf of my clients, I would

10  offer the following, which I think Ms. Libby was getting to,

11  which is -- and Mr. Nicas went through this a moment ago.

12  The cash change that arose from a somewhat longer

13  case, a somewhat more expensive case, and the kind of happy

14  conclusion of getting a little bit more value to equity, to the

15  tune of $17 million of cash, these are permanent needs, this is

16  not a short-term shift in working capital.  Everybody believes,

17  which is the reason my clients are happy with this proposal,

18  everybody believes that the company can more than handle the

19  debt.  As Mr. Nicas said, the operations seem to be on track

20  with people's expectations.  But there was this permanent

21  one-time use of cash, and so the notion that even if the board

22  had two weeks to redeem it, that they would somehow come up

23  with 40 million more of cash, whether by doing a new equity

24  offering, or a cheaper debt financing, those aren't real

25  plausible in the sense that nobody would roll into 40 million

1   of junior debt behind a 1.3 billion that will be there pursuant

2   to the plan, other than on more expensive terms.

3         I -- our clients, or my clients, were content to roll

4   into the debt on the existing terms, which I think is about

5   as --

6         THE COURT:  Well, let me do --

7         MR. FELDMAN:  -- (indiscernible).

8         THE COURT:  -- and I may be missing part of the

9   problem here, but it seems to me that if I don't approve this,

10  that the deal closes, and there's just $40 million less in cash

11  reserves, and, you know, the board could then borrow 40 million

12  more.  That's the only position I'm wondering whether we can --

13  you know, could the new board decide it doesn't want those 40

14  million of cash reserves, and therefore pre-pay it.  I don't

15  know that it's essential.  What's the call protection on the

16  40 million?  How much money are we talking about?

17        MR. FELDMAN:  Yes.  It's -- in the first year, the

18  call protection is two points.  So 2 percent of 40 million is,

19  what --

20        THE COURT:  Eight hundred --

21        MR. FELDMAN:  -- $800,000?

22        THE COURT:  -- it's $800,000.  Okay.

23        MR. FELDMAN:  Correct, yes.

24        THE COURT:  The board for $800,000, potentially spent

25  -- or a contingent of 800,000, can have the option of having 40

ACCESS TRANSCRIPTS, LLC              1-855-USE-ACCESS (873-2223)

1    million more of cash?  Is that one way of looking at this?

2          MR. FELDMAN:  I think it's precisely the right way to

3    look at it, Your Honor, and the cost of closing and then going

4    out and getting some type of new facility, or tacking on, in

5    terms of just transactional expenses, I would submit, from

6    experience, would likely exceed $800,000.

7          THE COURT:  Yeah.  Unfortunately, in a case this

8    size --

9          MR. FELDMAN:  Some markets, Your Honor, but --

10          THE COURT:  -- everything exceeds $800,000, so I

11    understand that part.

12          Mr. Silverberg, what's the committee's position on

13    this?

14          MR. SILVERBERG:  Your Honor, Bennett Silverberg on

15    behalf of the official equity committee.  We're supportive of

16    the debtor's proposed modifications and don't take any issue

17    with them.

18          THE COURT:  Okay.

19          Does anybody want to offer any objection to what's

20    happening here?  It seems like it's a kumbaya minute for

21    everybody other than perhaps me, and I want to hear if we have

22    any objections to it.  Okay.

23          Does anybody else --

24          MR. WINOGRAD:  Your Honor, may I speak --

25          THE COURT:  Yes, go ahead, Mr. Winograd.

1          MR. WINOGRAD:  Sorry, this is Mike Winograd from

2 Brown Rudnick, Your Honor, on behalf of the official equity

3 committee.  We don't have an objection, but I did want to just

4 preview a point with the Court.  We're hoping it won't require

5 the Court's intervention.  We're working diligently with

6 debtors and SVP, and I think we're close to resolving the

7 issue, but -- and I'm hopeful we will resolve the issue, but I

8 did just want to preview a small issue with you to the extent

9 that it needs to be raised in the coming weeks.

10          THE COURT:  All right.  Let -- but it -- should we

11 finish this, and then I'll come back to you before we finish

12 the hearing?  Is that what you're asking to do?

13          MR. WINOGRAD:  Sure.  That's fine, Your Honor.

14          THE COURT:  Okay.

15          Does anybody else want to pitch in on the notice

16 issue, and argue anything different than what Mr. Nicas has

17 argued already?  If so, please press "five star" one time.  All

18 right.

19          I think, although it's not entirely clear, that

20 3019(a), as Mr. Nicas argued, should apply in the situation

21 where you are still before the effective date, because we are

22 under the terms of the confirmation order, we have not yet made

23 any changes by confirming a plan that hasn't yet gone

24 effective.  And although the rule is not absolutely clear about

25 that, it is, I think, the best analogy.  And I don't think this

22

1  is a material adverse change, I don't think it's an adverse

2  change at all.  I think it is only favorable to the debtor, and

3  the parties that are entitled to notice under 3019(a) are given

4  that notice.

5       The only other thing I was able to find when

6  preparing for the hearing that might govern this is Rule 2002,

7  which might require notice to everybody in the case, and it

8  just doesn't seem to me that this is the type of change that

9  would require that from a logical point of view, especially

10  given the presence of 3019(a).

11       So although I may change my mind in a future case,

12  I'm not guaranteeing to everybody this will always work,

13  because somebody's going to be more prepared for arguments next

14  time, but I'm raising the notice question this time, but --

15  hold on, I'm getting a lot of background noise.  Let me see if

16  I can --

17       Whoever has some folks talking in the background, can

18  you please mute your own line?

19       I'll try it again.  So I think that 3019(a) is most

20  likely to be the governing rule, and if not the governing rule,

21  then I believe under the basic principles of the rule, which is

22  that the purpose of the rules is the just, efficient

23  application of the rules to the Code that notice is adequate.

24  This appears to me to be entirely in the best interest of all

25  parties concerned, and for all of those who are directly

1  concerned, they have consented.

2       As to others, it appears not to diminish feasibility,

3  i.e., the payment of additional debt service on the $40

4  million, anywhere near as much as it enhances feasibility by

5  giving the debtors $40 million in cash.

6       Finally, this exact outcome, in my view, is

7  authorized by the plan, but it would occur -- it could occur

8  shortly after the effective date, and if I wait and let it

9  occur after the effective date, I think the parties are

10  absolutely right, that this debt would be more expensive, both

11  from an actual interest rate point of view, but also and maybe

12  even more importantly, just the legal expenses are going to be

13  huge in order to do it.

14       So I'm not authorizing anything that the board

15  couldn't do, I'm just making it cheaper.  And the cost of me

16  making it cheaper, with everybody's consent here, in my view is

17  the $800,000 that's only a contingency, so that if the new

18  board sees something that no one on the call has seen, and that

19  I'm not seeing, and decides this was a bad decision, I've only

20  imposed an $800,000 cost on the new board.

21       I really can't imagine the board of a reorganized

22  company like this that is very much a capital needs company,

23  from deciding that capital at this cost to enhance the

24  liquidity of the balance sheet from $40 million, if the board

25  decides that's a bad idea, I'll be pretty surprised, like

1 everybody on the call will be, but leaving the board that

2 option in case we're just really missing something, that tells

3 me that it's okay to do it.  So I'm going to approve the

4 modification as a matter of principle.

5          I don't know if you want any evidence in support of

6 it, given that it's unopposed, Mr. Nicas, or if you want me to

7 simply accept the logic of it and the representation of

8 counsel, but, you know, you tell me what you need to do in

9 order to prove this up, and I'll give you that opportunity.

10          MR. NICAS:  Thank you, Your Honor.  We believe that

11 no evidence is actually necessary at this juncture.  We would

12 ask that you approve the order that's attached to the motion.

13          THE COURT:  All right.  Just a minute.  I'm just

14 putting it into a form that can go directly into docketing, so

15 that we can get this done this afternoon.  This won't take but

16 a second.

17          Any objection to the form of the order by anyone?

18 All right.  That will be docketed, probably before we finish

19 the hearing, but we'll see.

20          Mr. Winograd, you had something you wanted to say?

21          MR. WINOGRAD:  Yes, Your Honor, thank you.  Again,

22 Michael Winograd for the record, of Brown Rudnick, on behalf of

23 the official equity committee.

24          And again, Your Honor, I just want to raise very

25 briefly a point that may require the Court's intervention.  We

1  hope it will not.  We're working diligently with debtors and

2  SVP to resolve the issue.  We think we're close.  We're hopeful

3  we will resolve it.  We've worked cooperatively throughout this

4  case thus far.

5          But just in case, I did want to preview the issue

6  with Your Honor.  It relates to the limited liability company

7  agreement, which is at Docket Number 977, and specifically,

8  Section 11.3(b) as in boy, which is at ECF Page 80 of 109, at

9  Docket 977.

10         And that provision, Your Honor, is entitled press

11 release communications.  It deals with public statements, and

12 it effectively says that all public statements are controlled

13 by the board, it's up to the board to -- you know, any such

14 public statement shall be made only and such -- and at such

15 time and in such manner as determined by the board.  These

16 relate to any public statements by -- with respect to the LLC

17 agreement or anything related thereto, which easily is -- could

18 be interpreted, we fear, as relating to the company generally.

19         And our concern with this is that it potentially

20 impinges the ability of the minority shareholders to exercise

21 minority protections.  For example, in order to trade their

22 units, which is an express protection, they would need to,

23 presumably, find a market on, for example, a Yahoo platform.

24 This potentially would prevent that.  It would eliminate their

25 ability to protect against unfair transactions by voicing their

1 concerns over sort of actions that are being taken by the

2 company.

3          The LLC raised these concerns beforehand.  It

4 provided comments that specifically requested that this

5 provision come out.  The debtors and SVP took some but not all

6 comments.  They left this provision in.  The document was filed

7 the LLCA with the understanding that it would be -- the OEC

8 reserved its rights to challenge any specific provisions.  And

9 we have concerns over this provision.

10          Again, we are working on the language, and we're

11 working with SVP and the debtors to hopefully resolve this

12 issue, but again, Your Honor, I just did want to raise it with

13 Your Honor in case we needed to be heard prior to the

14 confirmation of the plan, which I believe is scheduled for

15 October 15th.

16          MS. LIBBY:  Your Honor, if I may speak?

17          THE COURT:  Sure.

18          MS. LIBBY:  Your Honor, this particular provision is

19 one that folks have been going back and forth on the drafting.

20 It's completely unclear whether there's any dispute at this

21 point.  As Mr. Winograd said, the parties are working together

22 to try to resolve any concerns.

23          The case has been shockingly consensual since the

24 confirmation, and we expect that it will very much continue to

25 be, and we are very much in real time, even before the hearing,

1  just making sure that we prioritize those comments from the

2  OEC.  I think in all honesty, we didn't appreciate the urgency

3  that they viewed it under prior to this hearing.  But, you

4  know, they raised it today, and we've been working with them

5  today to resolve, and we fully expect that we will do so

6  without having to come back before Your Honor in any form or

7  fashion.

8           THE COURT:  I do, too, Ms. Libby.  When are you going

9  to try and close?

10          MS. LIBBY:  We were targeting Friday, but it looks

11 like, given that it's a multi-step closing, we are likely going

12 to start closing on Monday, is the current goal.  And we -- the

13 -- we will absolutely not keep the OEC on pins and needles

14 until then.  We are actively working to resolve things, and

15 folks spoke right before this hearing.  I expect it'll get

16 resolved today, if not first thing in the morning.

17          THE COURT:  So what I want to do is to assure that I

18 don't delay your closing.  Would it help if I just gave you a

19 standby hearing at 8:45 on Monday morning, the 18th, so that if

20 you do have a problem, I'll resolve it then?  Or would you

21 rather not have that standby hearing?  It's really up to you.

22          MS. LIBBY:  You know, Your Honor, it can't hurt to

23 have it scheduled, or have Your Honor block time, if you would

24 be so gracious to do so.  But we truly really do not expect

25 that we'll need that time.

1        THE COURT:  Yeah.  Do me a favor, and if you don't

2   need it -- I'm going to go ahead and put it down at 8:45, just

3   a plan effectiveness status conference at 845 in the morning on

4   the 18th.  And I'm going to tell Ms. Doe that if she receives

5   an email from you and Mr. Winograd, where you're both on it,

6   that cancels the need for the hearing, that we'll just take it

7   off the docket.  But that'll give you all weekend to try to

8   work through it, and it'll also give you a closing for sure.

9   Because I promise I will make a sentence like that work.  I

10  don't know what it'll say, because I don't really understand

11  the problem.  But, you know, that isn't going to hold up your

12  closing.  But you may need somebody just to be, you know, the

13  Tsar that tells you what that magic word's going to be, and I

14  don't want to delay you by you needing to get on my calendar.

15  So if that works for you all, that's what we'll do.

16        Mr. Winograd, do you mind that arrangement?

17        MR. WINOGRAD:  No, that sounds great, Your Honor.

18        THE COURT:  All right.  So I think having the

19  hearing, there's no way you're going to need it, now that you

20  have it, so you've got it.  But take it away from me as soon as

21  you can.

22        What else can we do today?

23        MR. NICAS:  Your Honor, from the debtor's

24  perspective, nothing else.  We appreciate Your Honor's

25  questions, and we greatly look forward to closing of this case,

29

1 and emerging in the very near term.

2          THE COURT:  I look forward to that as well.  Thank

3 you all for coming in today.  Sorry that I ended up with a lot

4 of questions about this, but I wanted to be sure where we were

5 going, and you answered them all, and that's very much

6 appreciated.  So thank you, and we'll go ahead and adjourn the

7 hearing.

8          MR. NICAS:  Thank you, Your Honor.

9          MR. WINOGRAD:  Thank you, Your Honor.

10     (Proceedings concluded at 3:08 p.m.)

11               *  *  *  *  *

12

13

14          **C E R T I F I C A T I O N**

15

16          I, Alicia Jarrett, court-approved transcriber, hereby

17 certify that the foregoing is a correct transcript from the

18 official electronic sound recording of the proceedings in the

19 above-entitled matter.

20

21

22

23 _____

24 ALICIA JARRETT, AAERT NO. 428     DATE: October 14, 2021

25 ACCESS TRANSCRIPTS, LLC